This time we'll hear in Re. Tremont Securities Law, State Law, and Insurance Litigation. Good morning. May it please the Court, I'm Vince Gresham, representing the Tremont Fund objectors. We are the first of three appellant objectors that you're going to hear from. In my time, I'm going to focus on two issues. First, I'm going to give you specific reasons why approval of this plan of allocation was in error, focusing on cross-investments, trustee contributions, and secret side deals. The second issue concerns the $40 million of additional 2015 fees that the District Court awarded in excess of the $30 million it awarded in 2011. I'm going to focus on the District Court's use of the litigation risk factor to enhance attorney's fees for time incurred after litigation risk had ended. With respect to the plan of allocation, the plan of allocation's treatment of cross-investments is irrational because it denies funds who settled with the Madoff trustee the benefits of the trustee settlement. It's indisputable that my client's Tremont market neutral funds paid millions to settle all trustee claims. Yet, the plan of allocation calculates cross-investments as if those settled claims are still outstanding. Now, weren't they clawback claims? The claims that you're claiming. Yes, the same claims for all the funds. Now, it's one thing to tell an ordinary investor, you're a net winner and therefore we're not going to allocate to you. However, it's quite another to say that to a settling fund that was specifically included in the trustee settlement and paid to settle all net winner claims. The benefit to my clients of the trustee settlement was to resolve all net winner claims so that their Tremont market neutral funds could participate in the economics of the trustee recovery. Does the virtual SIPA claims address that problem in any way? No, Your Honor. The virtual claims address the trustee contribution issue. The cross-investment issue is not addressed. They simply deducted, like I said, deducted as if the claims still existed. Now... Isn't that a substantial benefit to your clients, the virtual claims adjustment? The virtual claims adjustment doesn't relate to the cross-investments I'm talking about now. It relates to the trustee contribution issue that I'm going to get to in just a second. With respect to the cross-investments, because the Tremont market neutral funds were parties to the trustee settlements, it's irrational to deny them recovery from the trustee settlement as if the trustee claims were still outstanding. Now, with respect to the trustee contribution and virtual claim issue that you just raised a moment ago, with respect to trustee contributions, the plan of allocation irrationally treats similar contributions differently. Although we didn't know this in the previous appeal, we have now discovered that both RY funds and Tremont funds made trustee contributions. For example, RY Offshore made a trustee contribution in 2011, just like my client's Tremont market neutral funds did. But although both RY funds and Tremont funds made trustee contributions, the plan of allocation treats them differently. RY Onshore's trustee contribution is treated as a Madoff-related loss, entitling this RY fund to a trustee recovery of its contribution of approximately 80%. In contrast, the Tremont market neutral funds' trustee contributions are not treated as a Madoff loss, but rather the plan of allocation gives them a virtual claim. We argued at first it was virtually worthless, but now we've discovered we're getting about 32 cents on the dollar as opposed to the 80 cents on the dollar. It's the same trustee contribution. Then why are you getting 32 cents instead of 80 cents? I'm sorry? Why are you getting 32 cents instead of 80 cents? I thought it was 80%. Well, I think that's what the district court thought as well. But we aren't getting our virtual claims. When you do the math, they wind up paying 32 cents on the dollar, and we put that math in the brief that's there for you to check. But we are getting only 32 cents on a virtual claim. And once again, it's the same trustee settlement, the same trustee contributions. All the funds enjoy the same release, but yet there's different treatment. And we think all trustee contributions should be treated as Madoff-related losses and my client's Tremont market neutral funds not be relegated to a 32% or pennies-on-the-dollar virtual claim. Finally, it was irrational for the district court to approve a plan of allocation with secret side deals. The court viewed insider support as crucial in its approval of the plan of allocation and its belief that the plan of allocation was fair. However, the existence of side deal motivations eviscerates the district court's basis for approval. Even though we know the side deals are secret, the mere existence of them tells us that this plan of allocation was so flawed and so unfair, even those who created it don't support it on its merits, but they support it only based on secret side deal inducements not shared with ordinary investors. Finally, with respect to attorney's fees. Let me just ask you about the net investment method of allocation. Why is that unfair? You say that your client should get the benefit of the partnership documents, right? Why is that net investment approach that's been approved in so many cases here, why is that unfair to your client? Well, the net investment approach has been approved in cases dealing with SIPA claims among customers and broker-dealers. That has no relationship to what's at issue here, which is an allocation among partnership investors. Partnership investors, you typically look to state law, and these are Delaware entities, and as we pointed out in our brief, Delaware in particular has a very strong freedom of contract, a very strong policy of honoring the contracts. But how is it unfair? Just about everybody else who invests in Madoff has to be treated in this way. Why is it unfair to treat your clients that way? Well, I think I would focus the argument like I did earlier on the settling funds. It's unfair to treat the settling funds that way for two reasons. First, it's because they paid money to settle all trustee claims. If they settled the claims, they're no longer net winners. And I'll note also, those claims were never proven. They were settled. So that's the first answer, was going back to the settlement of the trustee actions. And that is the only benefit my clients have from the trustee settlement, would be to enable them to recover under the trustee recovery. And the second reason it's unfair to these particular settling funds is because, if you recall, the trustee settlement was itself the consideration for the Tremont Market Neutral Fund's derivative release in the investor settlement. Okay? So the trustee settlement was consideration for the derivative release. If you deny the Tremont Market Neutral Fund's a trustee recovery, then the derivative consideration that we received in the investor case is illusory. That's the amount of time. I hope you remember about the 70 million of attorney's fees. When you advocate for application of the partnership documents, the partnership documents would look to the account balances, correct? Of each... Capital accounts. Of each... Capital accounts. Now, would those capital accounts reflect or be influenced by phantom transactions that Madoff entered into? With respect to my Tremont Market Neutral Funds, our statements, nothing on our statements was fictitious because we actually had investments in the Rye Funds. Now, if you go up a level in the Rye Funds to invest it in Madoff... The Rye Funds were wiped out, right? So if they reflect investments in the Rye Funds and there's nothing in the Rye Funds, then you want application of a system that would be based in part upon phantom transactions generated by Madoff. Well, that's what the trustee settlement called for. If you recall, the settlement itself calls for the allocation of the trustee recovery to the three Rye Claimant Funds and then distributed to partners. And that's exactly what the settlement agreement says. And Judge Liflin, when he was approving that, said any body concerned about fees should look to their own investments operative documents in the proper jurisdiction. So the trustee settlement itself calls for the partnership based distribution. But if I can clarify one thing he said, he said, I was advocating for the trustee for the partnership capital account distributions. And actually, my brief, I point out the trustee settlement requires that and the plan of allocation violates it. But it also violates the investor settlement, which mandated, or Judge Brisset, when he was establishing the fund distribution account, he rejected the partnership approach. I know because I argued for it in opposing the fund distribution account. And he said no. I said you advocated for it and you just said you opposed it and you advocated for it. So you did advocate for it. I advocated for it in 2011 before the establishment of the FDA. I said, Your Honor, there's no reason to establish the FDA because the money goes into the partnership and then it's controlled by the contracts. And Judge Brisset, in a very important point on Appendix 583, 584, said the funds have agreed that those assets can be used for the purpose of paying investors. And I think the trustee settlement and the investor settlement, before Judge Brisset, I think they're in conflict and I think that needs to be addressed. But my point to you in this appeal was you don't need to resolve the conflict because their plan of allocation violates both the investor settlement and the trustee settlement. It's a hybrid. A really basic question. When you speak of a fund, or as in any investor, as a net winner or net loser, is that based on their condition before or after the trustee settlement? Okay. Well, when you talk about it, it's a complicated question. It's a complicated question. I know there's wheels within wheels. I'm just trying to get a grip on it. When you talk about net winner and net loser, I think you need to distinguish between investors and the settling funds. Let me make very clear, none of my clients ever received a penny of Madoff-related money, no matter how you want to trace it. They did not. So they, in no sense, are net winners. They are very much net losers. How come you contributed this money on the clawback? I'm sorry? How come you made a clawback contribution? Well, we didn't do it voluntarily, if you recall. That money was taken. I think you did. That money was taken from our Tremont market neutral funds, and we didn't find out about it for over a year. But the money was taken, and the issue now is do we get the benefit of the trustee settlement or not? Because if we paid $22 million and all we get out of it is a fund distribution account that strips us of the value of our cross-investments, that doesn't seem to be fair or equitable or just, and there are a lot of technical reasons, as we've all outlined in our briefs, why that's incorrect. You did get a release of it, right? I mean, Tremont did. Well, my limited partners, clients, the releases, they did not personally get a release. They never got any money to begin with. So the release has zero value for the limited partners. The Tremont market neutral funds got a release. In exchange, they're giving up 100% of their assets. In a limited partnership, who does a release benefit? It benefited the general partner defendants in the derivative action. So if you apply the FDA the way they do, then in this derivative action, the consideration, the release only benefits the defendants in the derivative action. The limited partners, we get nothing, and the entity was wiped out of all its money. Again, that's just... Thank you. Thank you. Good morning. Good morning, Your Honors. May it please the Court, Joshua Fruchter and Co-Counsel Gary Graceman on behalf of Appellant Mary Catherine Martin. So Mr. Martin's appeal raises two challenges. Number one, we challenge the district court's approval of class counsel's plan of allocation for the fund distribution account, and we raise three challenges, inadequate representation, lack of transparency, and preferential treatment without adequate justification. We also challenge the district court's denial of Mr. Martin's request to allocate the FDA pro rata as a receivership estate. And I would point out, that is exactly how the district court characterized the FDA, that as a receivership estate. And that would be subject to priority reimbursement in full of all fund transfers at the time of the trustee settlement based on the equitable principles in the Supreme Court's decision in Boeing v. Van Gemmer. And I'll begin now with our challenge to the approval of class counsel's plan. So number one, inadequate representation. Under this court's decisions and literary works, the court held that when a fundamental conflict develops between two subgroups concerning allocation of a fixed settlement fund, adequate representation requires subclasses with separate counsel. And the chief concern underlying those decisions is with class counsel simultaneously representing class members with conflicting interests regarding allocation. Wasn't there an elaborate and prolonged mediation in which everyone had an opportunity, everyone was certainly invited to participate? Sure. So the court addressed that issue in payment card interchange, which was the subject of our 28-J letter. And in payment card interchange, it was clear that the objectives were active participants in the mediation. And payment card interchange held that mediation is not a substitute for adequate representation because the mediator's job is not to advocate for any individual subgroup, but to bring the parties together. And I would add in this mediation, he came as an individual investor with a minuscule claim, about $600,000. And he did not show up there as the certified representative of the subclass with over $600 million in claims. So had the district court certified a subclass, appointed Mr. Marn as a representative, he would have come to that mediation representing $600 million in net losses. And actually, that fact, I believe, is in the — we had emergency papers that we filed with the court in March 2016, where we laid out all the net losses of all the — If everyone who had distinct interests in this enormous mediation had separate class counsel, how many lawyers would there have to be? Well, all the lawyers that were there were representing individual claimants. There was only one class counsel. And we just clearly were not — I mean, if every interest had to be separately represented in this apparently unique, very odd procedure, how many class counsel would there have to be? We think only one additional one was necessary, just class counsel. Just yours. Class counsel for the contributing Tremont funds, for investors who were invested exclusively in the Tremont funds, as opposed to having claims in multiple funds. It's like the — it's like in literary works. The court — after the court concluded there was inadequate representation, it recommended, I believe, having a separate class counsel for the category C authors. But you see here, you have net losers and funds that are net winners. You have net winners and funds that are net losers. You have net losers and funds that are net losers, and net winners and funds that are net winners. Then you've got funds that made contributions and ones that got something back, others that made contributions and didn't get anything back. You could just sort of end up — end up with a boatload of class counsel here, and you wouldn't be here now because the whole process would take a decade. Yes, I don't think the case was really any different than payment card interchange or literary works. You had many authors, and in payment card interchange you had many retailers. Ultimately, you have to look at who was the conflict between. There was a clear conflict between Tremont fund investors and David Roy fund investors, and that's the conflict that required separate counsel, because otherwise class counsel is representing separate interests, and I don't see that there would be a need for additional class counsel. It was just those two subgroups that had the conflict. Am I wrong to know that counsel for Martin participated in some of the mediation sessions? Right. So, as I mentioned, in payment card interchange, that was also the case. The objectives — She did, but she had conflicts. Right. So, Mr. — Let me just finish. She also agreed to the confidentiality agreement with the mediator, right? Right. So, there's a bit of a dispute about exactly what that confidentiality agreement provided. We think the plain language did not apply to agreements. But she had a lawyer involved in that. Yes, that was myself, actually. I was the lawyer. But when I appeared there, I appeared just as the attorney for an individual claim with a very small claim, and we had — I mean, if you actually look — there were actually two claimants in this case who filed almost the identical motion. We had Future Select requested subclasses and a pro-rata allocation, and Mr. Martin requested a certified subclass and pro-rata allocation. Class counsel cut a deal with Future Select because they withdrew their motion, and they had $132 million in net losses. Our clients, who had only $600,000, there was no deal. They actually tried to moot us out to offer us to pay off our claim. So, I mean, clearly we had no leverage without the imprimatur of a certified subclass. Thank you. Thank you. Good morning. May it please the Court, Richard Haddad for Philadelphia Financial Life Assurance Company. We ask that the order be reversed on jurisdictional and justiciability grounds, but even more fundamentally, because the order deprived my client of its procedural and substantive rights under the Limited Partnership Agreement, under Delaware law, and directly under the prior order of the district court approving the class action settlement, which order was affirmed by this court back in 2011. What did that say that this arrangement violates? That what it said was a class action settlement was fair, applying Rule 23 standards to a class action, and separately, that there will be a fund distribution account in which each limited partner shall be entitled to receive a disbursement. Section 1.18, it's at page 263 to 264 of the appendix. Each limited partner shall. What does that mean? I mean, you know, one is entitled to something that doesn't necessarily mean that you get it. Entitled to receive a disbursement. That was part of the order. Well, they could give you 10 cents, and then you'd have your disbursement. It obviously is not really, it's not an appreciable substantive protection. Well, it didn't get the 10 cents, but here's what we did have. Well, we're happy to give it to you. Well, if they pay my claim, I'd be happy to take that. But what happens here is looking at the Tremont Fund 3, and this is why the net investment method doesn't really work. Tremont Fund 3 was. Go slow now. Tremont Fund 3, I'm speaking of just that fund, which is one of the funds in which my client was a limited partner. Tremont Fund 3 was not a Ponzi scheme. It was not in a liquidation. Tremont Fund 3 was 80% legitimate assets, real securities, real value, real dollars, real trading gains and losses, and through other investments, 20% exposed to Madoff. Through investment in Rye. Yes. And so the capital account balance that appeared on the statement in December of 2008 was inflated by 20% of fictitious profits, because that money was not there. Just like if my mutual fund invested in RadioShack went bankrupt yesterday. Yeah. So now we are a limited partner with a $12 million capital account in December of 2008 in the Tremont Fund 3. We see an order in 2011 shall be entitled to receive a disbursement. And in the way that these guys drafted this agreement at the mediation, and it was a big mediation, I was there, had a very nice lunch, didn't get to say a whole lot, going to leave it confidential, but the way they came out of that mediation was with a consensus for a bunch of other people, 99% I think, that there were side deals and trades. We're not looking to upset the side deals and the trades. People can make whatever deals they want to make. But what they can't do is they can't decide amongst themselves to deprive my client of its rights under the limited partnership agreement or under Delaware law, which provides for how a fund will be liquidated, or our rights under the order of 2011, which says we shall be entitled to a distribution. And what the lower court did was it looked at the settlement in the context of a class action, applied the class action standards of, well, I'm looking at it, is it reasonable? I'm looking at it as the court found it significant that the vast majority of the folks supported it, and it was significant that only a few people didn't support it. Now, if this were a class action in which my rights were preserved if I could opt out or were excluded by the definition, I might not be aggrieved. I don't have those rights here. I don't have the rights to opt out. I don't have the rights. I've got nothing. I've got no claim, no money, no rights, and all of this is done... So you end up with only that four-fifths of the account, which was not invested in the right fund. Correct. But I didn't get that. And you get nothing. And I get nothing. In respect of the one-fifth that was invested in one of the rights. We're content to not get anything where there was no value. What we're not content with is to take away the remaining 80 percent of our capital account as of that day. And to address the question of the virtual SIPA claim, that arises when 51 million dollars of real, actual value, real assets in Fund 3 were paid, and there was an 80 percent claim. So we took, effectively, my client's money and others, paid it over, got a virtual SIPA claim, but we can't share in that. And we can't share in that with no summons, no complaint. This is not a class action. It's not appropriate to view it in the terms of, well, general consensus is good. I'm not looking to upset the whole issue. What I am looking to do is enforce and preserve my client's rights. What does your client have at the end of this day, assuming that everything proceeds as pursuant to the plan approved by the judge? Expressed in terms of percentage of the money you had in your account with the Tremont Fund. With the Tremont Fund 3, zero. Zero. We got nothing. It was zeroed out. Yes. And that had nothing to do with the balance, because there were real assets, real trading gains, and real trading losses at the end of the day, or the beginning of the day, in December 2008, when the Madoff fraud was disclosed. But it has everything to do with the way that this particular fund, the settlement was set up. Was the fund in which your client was or did it agree to a clawback arrangement? It agreed to make a payment. It resulted in the — it did agree to make that $51 million payment and got a virtual SIPA claim, among other claims. But none of that money flowed down to my client. And why that's — Then how did your client's money get, you would say, dissipated? Because the way that the definition of who can participate in the fund distribution account changed. It changed from what it was in 2011 to what it became much later in 2015. So all of the funds of that Tremont — were swept into the fund distribution account. And you don't get any of it? It doesn't really compute. That's not what happened. It was distributed on a fund-by-fund basis, and some of the other appellants are looking to do it sort of on a global basis, and we're not. We're looking to do it on the basis of each fund, because each fund has its own partnership agreement. Just talking about your fund. Just my fund. We get to have nothing based upon the decision to apply a net winner, net loser approach on a fund-by-fund basis. And that's never been done before with a fund that — If your fund was a net winner, how come you ended up with nothing? I'm not following this. Can I actually find it implausible? My client's claim, based upon the definition that they came up with, is that my client was a net winner. We don't believe that's an accurate description, and we don't — Your client, not necessarily the fund. No, that's correct, Your Honor. My particular client, Philadelphia Financial, based upon the way that this new definition came about, was deemed to be a net winner. Did your client take — Oh, I see. Has your client received, over time, more money than your client put into the fund? The answer is yes, but let's bear in mind that only 20 percent of that money was made off. And so when you look at it at the end, and we put a chart into our brief — Yes, Your Honor. And when we look at the math, we see that that came out precisely using Tremont's own records, which we referenced — we reported in our brief, referenced the citations to the record, which show a substantially larger capital account. And even if you subtracted 20 percent off of that, it's still more than we were a net winner. Thank you. We'll hear the other side. It looks like everybody's reserved a minute or two of rebuttal. So we'll be hearing you again for sure. Thank you. No, Your Honor, it's not. And I think Your Honors will recall from when we were here a few years ago on Tremont 1 and 2 that Philadelphia Life was a net winner. They were a net winner by almost over $8 million in their made-off related investments. Keep in mind that the fund distribution account is only a vehicle for the quasi-liquidation of Rye fund accounts. Only Rye funds. Tremont funds are impacted by virtue of their cross-investments in the Rye funds. So when we talk about Philadelphia Life, they are a net winner as an investor, as a whole, and they invested in four funds. And it's in their brief. In their investment in the Rye Onshore account, which was a fund that had a SIPPA claim, and we'll talk about that in a minute, they were a net winner by roughly $900,000. With regard to the prime fund, which was a Rye fund, that made a bankruptcy claim and made a contribution to the trustee settlement that went into the bankruptcy, keep in mind, and again, I think this got a little lost in the presentations, that all of the money that was paid to settle the clawback claims, the clawback claims, whether it was paid by a Tremont fund of funds like those that the appellants represent or have investors in, or whether it was paid by Rye Onshore or Offshore or Insurance, all of that money went into the Tremont, I'm sorry, the Madoff bankruptcy. The Rye Onshore, Rye Offshore, and Rye Insurance and one other fund were net losers, and so the SIPPA trustee recognized their claims as part of the settlement, the trustee settlement that we've talked a lot about, to the tune of about $2.1 billion, and also gave them a credit, again, because they were net losers, for the $800 million or so that they paid into the Madoff bankruptcy under 502H, and that was done, as you noted before, Your Honor, on that 80% basis. That was the level of credit that was given by the SIPPA trustee as part of the trustee settlement. That settlement settled $2.1 billion in clawback and other related claims against Tremont and Rye funds and Tremont itself. Net winner funds, like the funds of funds represented by the appellants, paid money into the bankruptcy, but they made no, absolutely no contribution to the fund distribution account. The only assets that poured over into the fund distribution account, which was created as part of the derivative settlement that was approved previously in 2011 and affirmed by the court in Tremont 1 and 2, that account received the pour over of assets from the bankruptcy, which were the claims for Rye Onshore, Offshore, and Insurance. It also received cash. Only one fund had cash to do that, and that cash, as part of the plan of allocation, goes right back to them. It was the only fund that had cash, so it was very unique. Why were they singled out? Why did they put money into the Madoff trustee settlement? They didn't put money into the Madoff trustee settlement, but if they were like everybody else, they would have, and then they would have gotten maybe pennies on the dollar. Instead, they were relieved of the Madoff trustee settlement. The XL fund was not a Madoff customer. It had synthetic investments, and it had one cross-investment that was a collateralized obligation related to HSBC's swap. It was a swap investor. Why did you require them to put $32 million into a pot and then take it out again? We didn't bother them. They were part of the derivative settlement, and they got a benefit, Your Honor, here. They got a separate benefit related to their cross-investment in the collateralized obligation. If you'll recall, there was a resolution of an administrative dispute between the XL fund and HSBC related to the collateral that resulted in another payment. XL fund investors, absent this mechanism, those two resolutions, would not have otherwise gotten any benefit from the FDA, but they did as a result of that. But I don't want to get too far afield from the detail. I know it is, and there are a lot of details, and Your Honor correctly pointed out that this all came out of 18 months of multiple mediation sessions, conversations, meetings, countless parties. Correct me if I'm wrong, but it looks as though there was a class action, and it was brought by, it was a derivative action, really, by the investors in the Tremont funds, and it resulted in a settlement, and class action was paid. Where does this proceeding fit into that? It almost looks as though people went to Judge Grizzay and said, you know, it would really be helpful if you assisted us by ordering whatever it is we all come up with, because otherwise we'll be in a state of nature. Judge Grizzay said, okay, give me stuff and I'll order it. There may not be jurisdiction for this. You'll have to convince me. So it's interesting, Your Honor, because it seems like that now, because all we're here with is not a settlement. We're talking about just simply the plan of allocation. The settlement below had two components. We settled class claims. That was $100 million plus payment that went into the net derivative claims. And the derivative claims were a major driver of the litigation below, and those claims, as part of the driver there, were a driver that also was related to the trustee settlement. And so part of the whole mechanism here and the structuring of this fund was designed to create a structure whereby the trustee settlement could take place, and those claims would have a place to go from a funding standpoint, and also to create a structure that would allow for funding. You'll recall that a big part of the funding of the trustee settlement was by a loan, which has since been paid off from the bankruptcy. To follow up on one of your other series of arguments, there's this enormous amount of money and there are funds that are entitled to it, and it's been decided how much each one gets, and why can't they rely on their own internal documents and contracts? You don't turn to equity if you have a contract. And then why was all of this required? It's head spinning, and maybe it would be just as confusing and difficult and ramified if you followed the contracts, but there were contracts. There were contracts here, but Your Honor hit the nail on the head earlier when you noted that the phantom claims here, this Madoff Ponzi scheme, wreaked havoc on the financial statements and the capital accounts. That's why we don't look to the last statements in this context. It's a net equity-related resolution. And what this consensus plan that was adopted by the District Court does is it does a few very, very critical things. First of all, it preserves all cross-investments for all funds, the Tremont funds of funds and the other funds represented by appellants and the Rye funds. It does that on a fund-by-fund, investment-by-investment basis. Again, a net equity calculation done on a net investment basis. Absent doing that, a number of the funds that are participating, including some represented by the appellants, would not share because they were net winner funds in the fund-by-investment basis. Those cross-investments are often not net winner investments. So they're fully preserved, fully recognized in the plan of allocation. The second thing it does is it creates the virtual SIPC claims that Judge Droney was asking about earlier. Those claims are an artificial construct that were done to reflect precisely the contributions made by the Tremont funds of funds into the Madoff bankruptcy. Again, not into the FDA. They didn't make any contribution to the FDA at all. But the Rye Onshore and Rye Offshore funds agreed, and there are no objectives to this. We have the full support of those funds. They agreed to give up part of the money they were entitled to out of the trustee settlement to create these virtual SIPC claims on the same basis that they got the money, this 80 percent basis. No priority payments. In other words, the Rye Onshore and Offshore funds have a 502H claim that the SIPC trustee recognized as part of the trustee settlement, which was part of all of this, that they would get a 502H claim on an 80 percent basis. So they paid a billion dollars. They got an $800 million claim. What we did with the virtual SIPC claims was we said, okay, for the contributions that were made to the Tremont bankruptcy by these funds of funds, by some of the appellant investors, we are going to treat those the same way. We are going to give you a credit for 80 percent of that contribution to the bankruptcy, and we are going to allocate that out of the FDA. Now, how significant is that? For the Tremont market neutral fund, that virtual SIPC claim is worth eight times their cross investments. Eight times their cross investments. And keep in mind, their cross investments were the only legal right they had to share in the FDA. For the Tremont market neutral fund, too, another one of Mr. Gresham's clients, it's about 12 times their cross investments. In Tremont opportunity fund, too, it's almost 20 times their cross investments. So the virtual SIPC claims for a number of the Tremont fund of funds became even far more valuable than their otherwise recognized cross investments, which they also get. Mr. Gresham is simply wrong when he says that Tremont market neutral fund, for example, does not get its cross investments. That's just simply incorrect. They do have cross investments because, again, we look on a net basis. They have a cross investment in the XL fund and a cross investment in the prime fund. Net cross investments. And they have their virtual SIPC claim. Tremont market neutral fund has net cross investments, in other words, their net losers, in the XL fund and the prime fund. The same is true for Tremont opportunity fund, too. In the case, and by the way, we also did this at the individual investor level. So for Philadelphia Life, even though they were a net winner overall, we looked at their investments on a fund by fund basis. So for two funds where they were net losers, they will actually get a payment despite the fact that in total, if we were to include all of their investments, they would have been a net winner. But to make it equitable for every investor and to give them a piece of their made-off exposure in every fund that they were invested in, if that investment, the cross investment, was a net loser, they got it. One last point related to Philadelphia Life, because I think it's important, at least just for clarity's sake. The Tremont funds are not administered here, other than payments on their claims that are being made out of the FDA. In other words, claims in recognition of investments in the RI funds, the cross investments, or the virtual SIPC claims. That's it. Any other assets that the Tremont funds or fund-to-funds may have had were administered by Tremont. They were administered separately. They have nothing to do with this case. And as Your Honors noted in Tremont 1 and 2, even the claims related to what they paid into the made-off bankruptcy were not part of this case. They never were part of this case. Thank you. May it please the Court, Irwin Warren, Weil Gottschall, and Manjis for the RI fund holders. Your Honor, the order below should be affirmed. An equitable plan is not necessarily a plan that everyone will like. Frankly, not everyone likes the plan here. But there can be no serious argument as to whether this plan is fair and equitable. It unquestionably is. It unquestionably did not. How can Mr. Gresham and Mr. Haddad say we get nothing when the whole structure of the POA is designed to get money up to people who have no claim if one were to just interplead the FDA? Mr. Haddad's client is a multi-million dollar net winner in this case. It gets money. Because everybody gets money as long as you had net equity in something that either was a net loser, directly or indirectly, or paid money to the trustee, because then you share in the net equity. Now, payment into the FDA itself, to go to Your Honor's question, was required under the original class derivative settlement. That's already been decided, it's final, and I don't think they can go collaterally attack a ruling, including the fact that the court clearly had subject matter jurisdiction to enter that to approve your settlement. I think that the distribution arrangements are part and parcel of a settled class action that created a fund without specifying how that fund would be distributed. Absolutely right. It was class and derivative claims. It required the money to get poured into the FDA, including the money from the trustee's settlement, which I'm going to get to in a moment. But that has already been here. It has come up to this court, back down and back up to the court. The approval of that settlement is final. It can't be collaterally attacked, and it's res judicata. Now, fairly inequitable by hypothesis must mean several things, Your Honor. Number one, it means you respect the law, including as this circuit has set it out in Madoff and before that in Newtimes. Equally important, one must respect and enforce the trustee's settlement to which each and every one of the funds in which these appellants invested not just benefited but was a signatory and covenanted that they would enforce the payments. Number two, one must respect the bankruptcy court order, which is now final, and approve that settlement, pursuant to which the Rye funds are expected to recover from the SIPA recoveries and the Tremont funds, including the ones in which they invested, got releases against claims for clawback that would have wiped them out if they were litigated. Now, contrary to Mr. Gresham's point, the POA in all of those ways respects the bankruptcy court. Certainly, Your Honor. We're in the record of the calculations, the net winner, net loser calculations for the various funds. I'm not certain of that. I know that certainly Mr. Haddad's clients have in his brief a chart of everything they own. But the point is, Your Honor, the FDA POA is set up so regardless of which fund was a net winner or not, which individual in Philadelphia Financials, the poster child, was a net winner or not, everybody who has an individual net equity, you've got Madoff down here, you've got the Rye funds up here, you've got the Tremont funds here, you've got the people who invested in them up here. The people up here, the real people who invested, you get money out of this FDA if you had net equity as long as you invested in any of the Tremont funds or a Rye fund that had any net equity in anything. And indeed, if you were a net loser, you had net equity up here at the top and you only invested in net winner funds. But your net winner fund paid money to the trustee to get out of that clawback case. Your fund has a net winner recovery. It has this virtual SIPA recovery and you get money based on that. Now they say, well, we have contracts. We have contract rights. And indeed, Mr. Gresham in his reply brief cited the Avery Partners case for the proposition of just how Delaware courts, how firmly they rely on the law of contract, the sanctity of contract. He cites the Avery case. With all due respect to him, I think he misread it, Your Honor, because I litigated the Avery case. I lost the Avery case. I lost the Avery case because I had a contract that was crystal clear, said the seller could not be liable beyond X and the court said, too bad, as a matter of Delaware public policy, we are not enforcing that plain language of the contract because it would permit a fraud to have a limit on liability. How ironic that he would cite Avery for the proposition that you should enforce the last statement method to enforce a Ponzi scheme and say, oh, as a matter of public policy, Delaware would enforce it. This court, Your Honor, you wrote New Times 2. You wrote Madoff 1. The language is it would be inequitable to do it. It would create absurdities to do it. It would be irrational to do it. Someone here just said that, oh, the bankruptcy court was all in favor of the net statement method. Your Honor, in the Madoff decision, in the text right after footnote 4, slightly different context, but the same bankruptcy court, you quoted, you said, after a hearing, the bankruptcy court upheld the trustees' use of the net investment method on the ground that the last customer statements could not be relied upon because the customer account statements were entirely fictitious. I don't think the bankruptcy judge woke up one morning and said, oh, I don't know what I was thinking about when I wrote that. That is exactly... Your argument, in a nutshell, is that you can't rely on contracts because the contracts return to books of account that are so perverted by Madoff's machinations that they're meaningless. Absolutely. We all know what people put in. We all know what we took out and everything after that is smoke and mirrors. And the whole point of what did people put in, what did we put out, and I had to spend a year in a mediation with Mr. Entwistle trying to see how much could he get out of the Rye funds, which is what we invested in. The notion that you would ignore Madoff 1, that you would ignore Madoff 2, you would ignore Newtimes, you would ignore the bankruptcy court settlement, the trustees' settlement, you would ignore the bankruptcy court order, you would ignore their funds covenant that the FDA goes to the three Rye funds and their partners and investors only. The notion there and that the 502H claim goes to those funds only. And the notion that they are saying either ignore it or you go rewrite the trustees' settlement, I don't think is something one could do, much less in the guise of saying, oh, the district judge abused his discretion. Thank you, Your Honor. I'm sorry, I've overstayed my welcome. All right. Your Honor, if I may just answer Judge Cronin's question about the net equity calculations. All right. Your Honor, that information is not in the record per se. What happened here was the net settlement fund was administered first because that plan of allocation which came out of the same mediation was administered first. So the claims administrator, Garden City Group, had claims there. So they had a lot of information and they used the money in, money out, right, from Tremont itself. When we got to the fund distribution account, we went through a different process. We went through the entire calculation. Garden City Group had the prior information. Then they went back to the Tremont funds, again, did the same net investment method calculation. But then they went a step further and sent letters out to every participant in the funds, setting out the calculation and giving them an opportunity to come back to them with any questions, concerns, or other information they may have had so that we would have the most possible complete calculation for each investor's net equity in the funds they invested in. That was the process here. So Garden City Group has all that information. The process or methodology for that is set forth in the papers below and in the plan itself. Thank you. Good afternoon. Good afternoon already. Good afternoon, Your Honor. John Vassos and Morgan Lewis-Bakke is here on behalf of a group of a number of insurers, starting with Delaware Life, New York Life, and MetLife. My insurer clients are here representing the interests of their policyholders. It is actually their policyholders through the insurance companies that are investors. Your policyholders had an option of investing in A, B, or C, and one of them was the Tremont funds. That's exactly right. The insurers and their policyholders fully support the proposed plan of allocation, believe it to be fair and equitable. The insurers offered their support in the district court before Judge Grisey below. The reason I am here and only taking a moment or two of your time is I believe that we are in a somewhat unique position in that we have substantial interest in each of the main groups that are warring over the distribution of this money. The Tremont Opportunity Fund 3, in which my clients are invested. Does that mean you have a conflict of interest? Not at all. We have multiple interests at play here and you have to work through them and there is a definite interplay. But as investors in top three, we are the sole investors in the Ryan Insurance Fund, one of the three funds with recognized claims. Through top three, we are also contributors in the clawback claims to the Madoff settlement. That was some $100 million settlement and top three contributed overwhelmingly the largest chunk, $51.4 million of that claim. We are also significant net losers in the Net Winner Fund, having lost $19 million in the Rye Prime Fund and in fact lost $15 million in the Rye Excel Fund. So we approached this mediation which, as others have said, was a year-long marathon with completely open eyes and open arms to any and all suggestions and any and all approaches. I took that position at the mediations, said, we have no lock of you, we will consider all comers. And I had extensive discussions with all of the various lawyers who participated in that process. And at the end of the day, it was our conclusion that the plan that was proposed was a fair and equitable plan. We supported it in front of Judge Grisey. We offered our support. We think he acted reasonably and within his sound discretion in approving the plan. And we ask this Court to affirm that ruling. Your rebuttal, Mr. Grisham. Thank you, Your Honor. Lead counsel correctly stated this is a derivative settlement. Therefore, the representational analysis should also be subgroup representation. But both Rye and Tremont funds made trustee contributions. Both Rye and Tremont funds made cross-investments. And our argument is the Tremont funds were treated worse than the Rye funds. The Tremont funds did not have adequate representation at that mediation. One of our representatives was the Ross Group because they invested $190 million in Rye funds. Moreover, when they noticed problems with the plan of allocation, they did not support it. What did they do? Did they fight to make it better for everybody? No. They got paybacks for money for themselves. That was the nature of the representation at that mediation. Everyone was in it for themselves. They weren't doing wrong by grabbing all the money for themselves. It was just set up that way. The problem lies in the system, the representational system. And I think, for Your Honor's perspective, you can pick your poison. Who was class counsel representing in this negotiation so far as you were concerned? Class counsel was not representing anyone as we cite in our brief. Several times they stated they were acting as a mediator. What that meant was people like my clients, the little guys, didn't have representation. Yes, HSBC, half a billion dollars, they were there. Ross Group, $190 million, they were there. But who was representing the small people? Class counsel did not have a loyalty that was class counsel-licting with anybody else's interests. Class counsel was not there as a representative of anybody. Class counsel was there as basically an assistant mediator and they say that in their briefs. So that leaves this court in sort of a pick-your-poison position. If the funds are all the same, then the plan of allocation fails because I've shown that Tremont funds are treated differently. If the funds are different and should be treated differently, then the plan of allocation fails because of the mediation. As I've mentioned, no one was representing there. Everyone was there to maximize their own wealth and they did it through side deals. For example, we- Was there a motion made to Judge Grise to have someone appointed specifically to represent the interests of people whom you claim were disadvantaged? I believe Objector Martin made exactly this, a formal motion to that effect. We recited that several times in our objection papers that the representation was- You mean objection after the whole thing was over? Well, we cited it in our objection to the net settlement fund and we said the entire mediation process, and that's several months before the final- They split up the plan of allocation proceedings into two different things. We argued to increase the load star, but putting that aside, they split up the plan of allocation proceedings of the net settlement fund, which took several months, and then there's a whole separate proceeding with respect to the fund distribution account. The fact that six of your eight clients accepted the tender, does that factor into why there wasn't participation in the mediation? Is that relevant? No, it is irrelevant because the mediation occurred before any of those offers were accepted. The mediation occurred, I think, years before, but certainly months before, so no, that had no relevance to that issue. Lead counsel simply invited the largest of the large to divvy up the pot and everybody else got whatever was left. So the question I was asked about who class counsel was representing, I believe at page 46 of Plaintiff Appellee's brief, they say that the class representatives and class counsel were adequate representatives at the time of the 2011 settlement and were adequate representatives throughout the mediation. So class counsel did purport to represent all the investors at the mediation. And before Your Honor, Judge Jacobs, you had asked about what was the fault line here, because you're worried about creating too many subclasses. There's a very clear fault line here, and that's between the Rye Fund investors who invested 100 percent of their assets in Madoff and the Tremont Funds who were only partially invested in Madoff. And in the Court's 2013 decision, the Court acknowledged that fault line. So there was a fault line here, and class counsel could not simultaneously represent both of those subgroups. Your Honor also asked about Rye Excel. My time is short, so I'll just point to 49 to page 51 of our initial brief, where we explain why Rye Excel should not have been discriminated — they should have discriminated in favor of Rye Excel in giving back all their money, but only on a priority basis, and only giving back the 80 percent to the Tremont Funds on a non-priority basis. And in terms of the virtual SIPC claims, which was discussed at page 39 to 41 of our reply brief, we explain why the virtual  And in terms of the trustee settlements, class counsel told the bankruptcy court — and this is in the record at 1588 — that the trustee settlement should not be interpreted to control allocation of the FDA, and the bankruptcy court agreed. On page 1589, the bankruptcy court said, yes, the allocation issue is for Judge Grisey. So the trustee got up here and said that they support the settlement. But the real question for the insurer-at-police is, as a top three investor, the insurer-at-police would have received a far superior recovery under Mr. Martin's plan. So the question is, why do they support a far inferior recovery under class counsel's plan? As you said in our brief, that was the whole issue of the side deals, which were not disclosed. It just doesn't make sense to support an inferior recovery when they should really be looking out for their economic interest instead of supporting a superior recovery under Mr. Martin's plan. I don't know where the money is coming from. Well, I'll give you one example where there is direct evidence in the record of a side deal. Where was the money coming from? It could have been coming from the Rye Fund FLEs who wanted to secure support for their fantastic deal. So they paid perhaps the counsel fees of some of the disfavored investors who agreed to support them. Because otherwise there was no reason for them to support an inferior plan when they had Mr. Martin's plan, which gave them a superior recovery. It just doesn't make sense. Thank you. The net investment method has never been used where there's real assets. And in top three, there were 80 percent real assets. And I think Your Honor's decision in Madoff makes the point. Those statements were not entirely fictitious. They were 20 percent fictitious. To follow up one of the questions you asked on the other counsel about jurisdiction, Your Honor, we have agreed this. We believe there is no jurisdiction to allocate this fund distribution account. When you have a class action, you frequently have, indeed you pretty much have to have, a specification of who gets what on what basis subject to claims filed on certain forms. You don't just create a fund and shower it down from a high building for everybody to grab. You have to have a plan of allocation. So why isn't this within the jurisdiction of the Court that created the fund? There were two funds. There was a class action settlement. We were not within the scope of the definition of the class. We had no standing to appeal it. There was a class action settlement. Your Honor, this Court affirmed it. That's the class action. Separately, there is this fund distribution. It was pretty much what Your Honor suggested, which is, well, we have all this money. How are we going to do this? Hey, Judge Brzee, will you bless this? That was not part of the complaint in that action. There was no summons served on my claim. The alternative would have been to have the money in a large pot and let people fight about it. The alternative would have been to distribute the money to the different partnerships and let the partnerships, each of whom had a claim, distribute it in accordance with their own contract documents. Havoc doesn't trump contracts with jurisdiction. Wouldn't that mean distribution in great measure on the basis of the arbitrary and psychopathic entries made by Madoff? Not to the extent of the 80 percent that remained. And in fact, counsel for Delaware Life just made this point. The top three, which is where my client's policyholders also chose to invest their money, took $51 million of real money, not Madoff money, not fake money, real money, real assets that had gains and losses, paid it, got a virtual claim, but then under the basis of the definition of who was going to then recover, their policyholders got the money, my policyholders didn't. And yet some of that was my policyholders' money that was paid to create this virtual SIPA claim in the first place. So, Your Honor, that is particularly unfair. I think, Your Honor, something like that can't be done without a complaint, without summons, without diversity or federal question jurisdiction. Your Honor, we submit that the order should be reversed as to my client and have my client's contract rights respected. There's enough money on reserve to allow these other folks to honor whatever deal they want to make all amongst themselves and still pay my client's claims. And that's the relief that we would ask. Thank you. Thank you, all. We will reserve decisions. The case of United States v. Hills is taken on submission. The case of McCrae v. Neato is taken on submission.